MONROE, J.
Upon August 28, 1911, plaintiff and defendant entered into a contract, for the nonexecution of which by defendant the district court has awarded plaintiff damages in the sum of $2,405.87, with interest, and both litigants have appealed. The contract reads as follows:
“This contract and agreement, made and entered into on the 28th day of August, 1911, by and between the Huie-Hodge Lumber Company, Limited, party of the first part, and t-he Usrey Lumber Company, party of the second part, both -being Louisiana incorporations.- The object of .the party of the first part is to sell all hardwood stumpage into hardwood logs delivered at the mill of the party of the second part, which is to be built at or near. Danville, and to secure the shipment of the said product over the line of the N. L. & G. Railroad.
“The object of the party of the second part is to purchase all hardwood logs at the mill which they now contract to build at or near Danville and to manufacture same into lumber.
“The land on which this mill is to be built is the property of the party of the first part. They agree to furnish as much ground as is necessary for the building and operating of said hardwood mill, free of charge. Therefore it is agreed between the contracting parties:
“That the party of the first part is to (1) cut the timber into such lengths as is designated by the party of the second part, and the timber will be cut in a manner that will prevent splitting as much as possible; (2) to build all spurs or side tracks at the mill necessary 'for the unloading and storing of logs; (3) to furnish or build all necessary tracks for loading the finished product; (4) to deliver 10,000 feet, or over, daily of logs, on the side track at the mill, to' the party of the second part, of the following sizes and monthly percentage:
“Not more than ten per cent, cypress, 10" in diameter and over at little end, grade to make No. 1 common timbers. Not more than ten per cent, hickory, 10" in diameter and over at little end, grade to make No. 1 common timbers. Not more than forty per cent, red oak, 10" diameter and over at little end, grade to make No. 1 common timbers. Any amount of white oak, 10" diameter and over at little end, grade to make No. 1 common timbers.
“Party of the second part agrees: (1) That all the above-described timber is to be of the grade that will make No. 1 common timbers, said timbers to be graded by the rules adopted by Hardwood Manufacturers’ Association; (2) to build and operate a sawmill at or near Dan-ville that will have a daily capacity of not less than 10,000 feet; (3) to accept logs of the above size and description and to pay for same at the. rate of $9 per thousand feet; (4) that, if there should be logs that fall below the above grade or size, same will be accepted at $6.50 per thousand feet by scale. It is further agreed between the parties hereto that all logs shall be scaled by a competent scaler, who shall be jointly employed, and whose expenses shall be equally borne by contracting parties; all logs to be scaled at little end and across narrow way, between barks, and making proper allowance for all visible defects.
“A copy of all logs thusly scaled shall be furnished to both parties daily; and the report so furnished shall be the basis of settlement, which shall not be later than the 20th of the following month in which the logs were delivered.
“Huie-Hodge Lumber Co., Ltd.,
“By O. E. Hodge, Gen’l Mgr.
“Usrey Lumber Co.,
“By W. H. Fields.”
Plaintiff alleges that it erected the mill, as required by the contract, and notified defendant that it was ready to receive logs on December 1, 1911, and that, during the ten ’months following, and up to October 1, 1912, defendant made deliveries, aggregating, in log measure, as follows:
In December, 1911 93,524 feet
“ January, 1912 152,927 “
“ February, “ 154,739 “
“ March, “ 100,258 “
“ April, 118,113 “
“ May, “ 110,826 “
“ June, 228,812 “
“ July, 242,386 “
“ August, “ 152,647 “
“ September, “ 147,462 “
Total .1,501,694 feet
It further alleges that it was entitled to 3,050,000 feet, and repeatedly demanded that plaintiff deliver the minimum of 10,000 feet per day, as called for by the contract; that, in cutting and handling the (say 5,000 feet per day of) logs actually delivered, it made a profit of $7.50 per 1,000 feet, but that, being *516 prepared, and being under tbe expense required, to manufacture into lumber 10,000 feet per day, tbe average cost per 1,000 feet would have been reduced, and its profit increased by $2.50 per 1,000, had the 10,000 feet per day. been delivered. It therefore (in its petition) claimed, as loss of profit resulting from defendants alleged default, $2.-50 per 1,000 on 1,500,000 feet of logs delivered ; $10 per 1,000, on 1,548,204 feet, not delivered; $350 per month for ten months as one-half of its fixed charges during that period; and $5,000 as exemplary damages; making a total (according to its calculation) of $27,738. In this court, however, the entire claim is stated in two items, aggregating $10,246.88, as follows: Profit, at $7.43 per 1,000, on 1,098,306 feet of logs, $8,160.81; pro rata of fixed charges attributable to logs undelivered, $2,086.07.
Defendant’s contentions are: (i) That, though the contract may read differently, it was not contemplated that 10,000 feet of logs should be delivered on each day of the week and year, that it merely undertook to supply plaintiff with that number of logs upon the usual working days, under ordinary conditions, which meant from 20 to 22 days per month, but that the conditions during the months of December, 1911, and August, 1912, were not ordinary, because of the excessive rainfall, which prevented the logging of hardwood timber, and hence that, in calculating the number of days upon which it was obligated to deliver 10,000 feet of logs, there should be deducted, one week day in each week, all the Sundays and holidays, and a large proportion of the two months mentioned ; (2) that the scaling according to which defendant received the logs “was wrong and fraudulent, and that plaintiff persistently, fraudulently, and systematically pinched and reduced the scale of the logs, threw out, culled, and refused to accept timber that was merchantable according to the contract, and fraudulently failed to account therefor; that it used and manufactured timber not included in the scale, but reported to defendant as being culled and worthless;” and that, though, according to such scaling, plaintiff received 1,501,696 feet of logs, there was an “overrun” in the cutting and manufacturing of the same, so that it produced 1,889,-411 feet of lumber, from the excess of which it made a profit of $6,296.12.
[1] 1. Considering, first, the days upon which the logs were to be delivered, the pleadings and evidence disclose the following facts:
Some time in 1911 Mr. Fields, representing plaintiff, and Mr. Hodge, representing defendant, entered into negotiations, as a result of which Mr. Fields prepared a project of a contract and forwarded it to Mr. Hodge, for approval, and Mr. Hodge, on September 6, 1911, wrote to Mr. Fields in part as follows :
“We are in receipt of yours of a few days ago, with contract inclosed. You will note that I have rewritten this contract and have made very few changes; the only change of any importance was reducing the amount from 15,000 to 10,000, which you will remember was our understanding. I think, however, that we will be able to furnish you more, but will not be willing to contract for more. Aside from this, there is no material change in the contract.”
And the contract, as herein sued on, was entered into; the plaintiff thereby agreeing to erect the mill and to buy the hardwood logs to be there delivered, and defendant agreeing “to deliver 10,000 feet, or over, daily of logs on the side track at the mill.” Mr. Fields testifies (and is uncontradicted) that he notified Mr. Hodge verbally that he would be ready for work by November 15, 1911, but it is not shown at what time that notice was given, and, as it appears to have been informal, and possibly tentative, we conclude that the effective notice that defendant was ready to receive logs was giver! by means of a letter, dated December 4, 1911, and, as we infer, delivered on the same day, from which, from *518 the previous informal notice, and from the fact that the mill was so situated that defendant could not help knowing of its erection, we conclude that it should have been ready to deliver logs on December 5, 1911. On December 15th, however, we find that plaintiff, through Mr. Fields, wrote to defendant, as follows:
“Gentlemen: I have this _day gone into the affairs of our company here at Danville since starting up for regular running on -logs received under our contract. Mr. Hatchett [plaintiffs’ manager] advises me that he notified your company on December 1, 1911, that he had completed our part of the contract- and was ready for his daily log supply. Now I find that we have been furnished, up_ to date, Dec. 15, 1911, only 49,156, or a 'daily average of 3,781 feet, whereas we should have had at least the minimum amount under the contract of 130,000; and the mill, by reason of this fact, has run only 48 hours actual time. Now gentlemen, we have gone to much expense and time, and have built a substantial mill that we know will enable us to carry out our part of the contract, and we must insist that you fulfill your part, by furnishing at least the minimum quantity of 10,000 feet daily for every working day. If, for reason, this cannot be done, we shall expect that each and every daily shortage shall be covered during the days of the ensuing month. * * * ”
It is not denied that this letter was received by defendant; it is not alleged or shown that it was answered; and the transcript contains no hint or suggestion that defendant, then, or afterwards, objected to, or protested against, the construction thereby placed upon its contract, to the effect that it called for the delivery of 10,000 feet of logs every day, except Sundays, since between December 1st and December 15th there were two Sundays, deducting which, there were 13 days, and the letter states that plaintiff should have received 130,000 feet of logs.
On January 21, 1912, plaintiff again wrote to defendant, as follows:
“Gentlemen: I’ve just spent Saturday and today here, and have gone over the log situation thoroughly, from Dec. 1, to to-day, and advise the following: For 25 working days in December we should have had 250,000 feet, but received only 87,369; up to Jan. 20, 18 work days, we should have had 180,000 feet; we-have received only 99,311 feet; or a total of 186,680 feet for the 43 days, or a shortage of 243,320 feet, up to date. On Dec. 15 we outlined the situation and advised you that we expected the Dec. shortage made up during January. Instead of making up Dec. shortage, you have made a further shortagd, during the month, of 80,689 feet. Your Mr. Krine has promised repeatedly a full supply of logs. Your Mr. Hodge has promised, on three occasions, that the mill would be logged, but I find no logs at the mill Friday or Saturday, but 3% loads not spotted for Monday, with none hauled to track in the woods. I asked Mr. Krine, this morning, what instructions he had received in regard to logging us; his reply was: ‘Do the best you can for the hard wood mill.’ These instructions, it seems to us, should be supplemented by positive orders to ‘log that mill.’ The time for something positive must be done (sic). We. cannot sit here and run the mill on less than half time. Actual time run in Dec. 75 hours; actual time in Jan. 82 hours. Total time run during 43 working days, 15.7 days, or a fraction over one-third of the time. We have to pay our labor and supply bills, and this cannot be done on promises. I hnoio-you can; won’t you log us? Give us a definite reply as to what you are going to do.”
And still there was no attempt to controvert the assertion that defendant owed 10,000 feet of logs for every day except .Sunday, and no denial then, and none now, that defendant’s representatives, with that construction of the contract called to their attention, had repeatedly promised a full supply of logs. On July 18, 1912, plaintiff (through Hatchett, manager) wrote to Mr. Hodge, manager, etc., in part as follows:
“Dear Sir: We hereby call your attention to the fact that you are not complying with the terms of contract — providing that 10,000 ft. of logs shall be delivered to mill daily. You lacked about 22,000 ft. total, for month of June. We get from 5 to 7 hours run per day. We also ask that logs be cut to such lengths as may be named,” etc.
And on September 13, 1912, there was another letter from the same to the same, reading, in part:
“Please read this in the spirit that it is written in — not of antagonism or hostility — but a sincere desire to avoid trouble in the courts. You are now short one million feet of logs under contract agreement. * * * We have-had just 9 loads of logs in exactly one week, past. We cannot stand for this. There is only one way that I can keep our affairs out of court, *520 and that is for you to help me to do so by putting in 6 or 7 loads of logs daily till bad weather sets in. * * * ”
Being examined as a witness in this case, Mr. Hodge was allowed to give the following testimony, to wit:
“Q. What was the understanding about the clause in which the Huie-Hodge Lumber Company agrees to deliver 10,000 feet, or over, daily of logs to the plaintiff company? (Plaintiff objects to this and any other testimony going to contradict or vary the terms of the written document sued on. Objection over-ruled by the court.) A. It was my understanding that these logs would be delivered on an average number of days for ordinary operations. Q. You mean working days? A. Working days.
“Cross-examination: * * * Q. Was there any discussion between you and Mr. Fields as to what that meant? A. None at all; not that I z-emember.”
Mr. Fields, being asked what he understood by the clause referred to, replied:
“My understanding was that six days to the week was meant — meaning 52 weeks in the year.”
And he further testified as follows:
“Q. Mr. Fields, did you ever receive any denial from Mr. Hodge that there were not (?) 18 working days in the month of January, 1912, between the 1st and the 20th? (Objection and ruling.) A. I did not. * * *
“Cross-examination: * * * Q. Do you not know, as testified to by Mr-. Hatchett and by Mr. Howell and by Mr. Meek, that 20 to 22 days is a good full average number of working days per month in a hardwood mill? A. That is an average where a mill is run to its full capacity; but, where a mill has only half its capacity, it has ample time to keep its mill in good repair and work the 26 days in the month.”
There is no attempt to question or contradict the testimony adduced by plaintiff to the effect that its mill has a capacity of 20,000 feet per day, so that, even if it had been called on to cut 10,000 feet of logs per day, there would still have been plenty of time for repairs; the necessity for making which, as we understand the testimony, is all that prevents mills from running on full time and from making more than, say 20 ox-22 days in a month. We conclude, then, that the contract sued on called for the delivery of 10,000 feet of logs upon every day from December 5, 1911, to September 30, 1912, inclusive, except Sundays and Christmas day, being a total of 259 days, and of 2,590,000 feet of logs.
It is said that defendant should be allowed deduction on account of the bad weather in December, 1912, and August, 1913, and the evidence shows that there were excessive rains during those months. It also shows, however, that, although defendant did not deliver the logs required by the contract in either of the ten months which are here in controversy, it delivered more in the wet xnonth of August than in the dry months of March, April, May, or September, and within a few hundred feet of as many as it delivered in February; and that, it delivered within 7,000 feet of as many in December as in March. It also shows that, whilst defendant delivered but 93,524 feet to plaintiff in December, and but 152,647 feet in August, it delivered to its own mills 1,001,616 feet of pine in December, and 1,641,787 feet of pine in Augixst; and that, throughout the ten months, it delivered to itself more than ten times the logs that it delivered to plaintiff. It further shows that the advent of wet weather is a thing to be expected and prepared for, and that prudent mill men lay in a supply of logs in advance. And, finally, it shows that those who control the defendant company also control 40 miles of railroad, with spurs running out, used for logging, and 100,000,000 feet of timber, and we infer from the testimony that the wet places are not the only ones from which so small a quantity as 10,000 feet per day of hard wood could have been obtained. We are therefore of opinion that defendant is not entitled to any deduction on account of bad weather.
[2] 2. It is undisputed that the total quantity of logs delivered, according to the “joint scale,” was 1,501,694 feet; thereby leaving a deficit of 1,088,306 feet.
*522 The contract, as will be seen, contains the stipulations (among others):
“Party of the second part [plaintiff] agrees: (1) That all of the above-described timber is to be of the grade that will make No. 1 common timbers, said timbers to be graded by the rules adopted by Hardwood Manufacturers’ Association; * * * (3) to accept logs of the above size and description, and to pay for same at the rate of $9.00 per 1,000 feet; (4) that, if there should be logs that fall below the above grade or size, same will be accepted at $0.50 per 1,000 feet by scale. It is further agreed between the parties hereto that all logs shall be scaled by a competent scaler, who shall be jointly employed, and whose expenses shall be equally borne by contracting parties; all logs to be sealed at little end and across narrow way, between barks, and making proper allowance for all visible defects. A copy of all logs thus scaled shall be furnished to both parties daily; and the report so furnished shall be the basis of the settlement, which shall not be later than the 20th of the following month in which the logs were delivered.”
The story of the employment of the “joint scaler” is told in the uncontradicted testimony of Mr. Hatchett as follows:
“When we were getting ready to accept logs, under the contract, to cut for the market, I was a stranger, and was not acquainted with any man who had any experience in scaling hard wood logs, and Mr. O. E. Hodge and Mr. Peters came to me. Mr. Hodge says: ‘Mr. Peters has been in my employment, and'I think he will make a good scaler, and I would suggest that, if it suits you, we employ him; that I will vouch for his honesty.’ Q. Did you find Mr. Peters to be a competent hard wood man? A. I did; yes, sir. Q. What were your instructions to Mr. Peters, as a joint scaler? A. To scale those logs according to that contract; to mix conscience with judgment; that, in matters of doubt, I would prefer that he should give to the Huie-Hodge Company the benefit of the doubt, because they had no representative there on the ground, except in Mr. Peters.”
It may be here explained that,, as it devolved on defendant to have the logs cut and hauled, and as it paid for that work at a certain rate per 1,000 feet, it kept in the woods a man who scaled the logs there arid reported to defendant, as did the joint scaler who did his work when the logs were delivered at the mill. Whether the original idea in having the logs scaled in the woods was merely to satisfy the cutters and the hauler, or whether it was in order that defendant might be able to check the work of one scaler against that of the other, or whether it was to subserve both purposes, does not appear. The scaler in the woods, Mr. Henry Lisenby, was called by defendant, and tilled, in part, as follows:
“Q. What is your connection with the IluieHodge Lumber Company? A. Cutting and scaling timber for them. * * * Q. Did you cut and scale the hard wood logs that have been delivered to the Usrey Lumber Company, under the contract, or rather, were they cut and scaled under your supervision? A. I did; yes, sir. * * * Q. What were the instructions from Mr. Hodge with reference to furnishing Mr. Hatchett timber? A. Well they told me to keep it cut; keep plenty of it cut; keep the teams going; and cut the timber clean. * * * O. You are acquainted with the method of scaling hard wood logs? A. Yes, sir. * * * Q. What Hardwood Association rules have you studied? A. I haven’t studied any of them. Q. As a matter of fact, have yo-u ever read any hard wood grading association specifications or rules? A. No, sir; I have not. Q. With what other than with the Huie-Hodge Lumber Company have you ever scaled hard wood logs and graded them? ,A. No other place. Q. What hard wood experts have you been associated with in your grading work, and who are they? A. No one, only Mr. Hatchett, Mr. Peters, and some few stave men, getting staves.”
According to the consensus of the testimony, there is a wide difference between the scaling of pine and of hard wood, and the rules of the Hardwood Manufacturers’ Association, by which the scaling and grading in this case were to be governed, are specific in regard to defects'which must be “scaled out” of hard wood under a contract calling for “No. 1 common,” and, more particularly, where, as in this instance, the timber was intended largely for the construction of cars. And of that requirement the witness seemed to be wholly ignorant. The witnesses who were. examined upon the subject also agree that, when men are sent into the woods, with instructions to “cut clean,” and are not informed of the calls of the contract upon which the timber is to be delivered, the result is likely or certain to be the cutting of a large proportion of worthless or unsuitable *524 timber. It will therefore be readily understood that, as Mr. Lisénby had no information in regard to plaintiff’s contract, knew little or nothing about scaling or grading hard wood, and was directed to “cut clean,” and as the cutters and hauler were to be paid by the 1,000 feet, regardless of grade, they sent into the mill a good deal of stuff that could not have been accepted by the joint scaler, whose duty it was to scale with reference to the grade called for by the contract. Beyond that, it appears that defendant was paying its cutters and hauler the same prices that were paid for cutting and hauling pine, whereas the usual prices for hard wood were considerably -higher. It is not altogether surprising, therefore, that the cutters and the haulers, and defendant also, became dissatisfied, and that the position of the scaler (in the woods) should have become very difficult; since, if he “pinched” his scale, the workmen threatened to quit, and, if he did not, defendant complained that it was paying for cutting and hauling according to a high scale, which the joint scaler, by whose scale it was being paid, was reducing. Another element which entered into the matter was that Mr. Peters, not being occupied with the sealing required of him more' than an hour and a half a day, was offered, and accepted, employment for the balance of his time by and under the plaintiff; that arrangement having been made within a month or two after he entered upon the discharge of his duties as joint scaler, and no notice of the same having been given to defendant, a circumstance upon which defendants’ counsel dwell with considerable emphasis. Whilst, however, we do not think it was the proper thing for either the plaintiff or the scaler to have done, we do not find that the evidence authorizes the conclusion which the learned counsel draw from it: First, because the employment was open, and we are satisfied that, although not consulted, or formally notified, defendant, through its officers, knew of it practically from the beginning; and, next, because it did not affect Mr. Hodge’s confidence in either the capacity or the honesty of the joint scaler, who, it will be remembered, went directly from Hodge’s employment to that position. Thus, on September 12, .1912, Mr. Hodge, wrote to Mr. Hatchett as follows:
“Dear Sir: Again referring to the conversation that we had some time ago with reference to our dissatisfaction with the scaler and the handling of the timber at Danville, as I told you, at that time, it is our intention to have another man to do this, at least for a while; not that we specially doubt Mr. Peters’ honesty or his ability, because we believe he is strictly honest, but all our hard wood log haulers are extremely dissatisfied with the scale that he is giving, and we are unable to keep a man to haul oak logs while he is sealmgs and, as a matter of experiment, we are going to make a change. If you know of a hard wood scaler, we would be glad to consider him for the place.”
And then follows the suggestion of the name of a Mr. O’Dell, of whom the writer had heard, but did not know.
Mr. Hodge also wrote to Mr. Peters, saying:
“Dear Sir: I have just written to Mr. Hatchett that, owing to the dissatisfaction of the men hauling hard wood logs,' it has become necessary that we make a change in the scaler, so we have decided to do this on the first of the month. We want to assure you, Mr. Peters, that we do not question your honesty in any way personally; the company has nothing against you. We do not believe that a man employed as a scaler should also accept wages to do other things around the mill, as these things are apt, more or less, to influence a man in that position, and we have never very strongly indorsed this. If there should be some othed position that is open that we could give you, we would be glad to do so.”
Mr. Hatchett replied that he was willing to try any man whom Mr. Hodge might send “with a copy of the contract in his possession,” and he took occasion to remind Mr. Hodge that he was 100,000 feet of logs behind in his deliveries for the month; that he was not delivering enough logs to need much scaling; and that he (Hatchett) could not hold his crew in that way, etc.
*526 Mr. Peters therefore retired about October 1, 1912, and was succeeded by another scaler, who remained a little while, when he was succeeded by another, and he by another, and finally, by mutual consent, Mr. Peters was re-employed, and was doing the scaling for the parties when this case was tried, in February, 1913.' There is no doubt a wide discrepancy between the woods scale, given by defendant’s scaler, which shows 2,086,162 feet delivered to plaintiff, and the joint scale of 1,501,691 feet, but we think it sufficiently accounted for by the explanation which has been given. The joint scaler was employed to scale with reference to a particular grhde, called for by a contract, and was bound, in so doing, to “make proper allowance for all visible defects.” The scaler in the woods did not know, and admitted that he did not know, the defects which the contract here in question required should be “scaled out.” In fact, he knew nothing of the contract and nothing of the rules of the Hardwood Manufacturers’ Association by which the scaling and grading of the lumber called for by the contract were to be governed, and he was directed to “cut clean.” On the other hand, because the cutters and the hauler insisted upon being paid at the same rate for cutting and hauling defective logs as sound ones, it does not follow that the joint scaler should certify unsound or defective logs to be the logs called for by plaintiff’s contract, or that plaintiff should. accept them as such. Mr. Thurman, the hauler employed by defendant, explains his attitude in the matter in four words, as follows:
“Q. After you found out that these people made deductions for visible defects, of course, under your contract with Mr. Hodge, you could not afford to accept the joint scale? A. Sure, I could not.”
There is also a wide discrepancy between the amount of timber received by plaintiff, log measure, and the amount of lumber produced from that timber, board measure. But the evidence shows that a large proportion of the logs delivered were small, and the law declares, and the parties agreed, that they should be scaled by the Doyle rule, of which the “Woodman’s Handbook,” issued by the Department of Agriculture, says:
“In general, the mill cut overruns the Doyle rule log scale by about 25 per cent, for short logs 12 to 20 inches in diameter; and for long logs, with a small top diameter, the overrun is very much higher.”
The learned and ingenious counsel for the defendant argue that the sole purpose to be accomplished in scaling a log is to find out the quantity of lumber that it will produce; and hence (to follow the argument to its logical conclusion), if more lumber is produced than the log scale calls for, that the purchaser of the logs should account to the seller for the difference. And, in the abstract, the proposition may be sound. But it would be impracticable for the purposes of everyday application, since no one buying or selling logs could well follow them into the lumber into which they are manufactured, in order to find out whether, by reason of the differences between log and board measure, he might be entitled to collect, or might be obligated to pay, a balance. Practically speaking, therefore, the object in view, in scaling logs, is to ascertain their contents according to the log scale rule under which, either by laio or agreement, the scaling is done; and, when that object is accomplished, the matter is at an end, unless there is fraud. In the instant case the answer alleges fraud, and the doors were wide open for defendant to prove it; but, it has not done so. To the -contrary, the letters of its manager, attesting the honesty and capacity of the scaler, without whose aid no fraud could have been perpetrated, have been offered in evidence, and he does not gainsay his certificate, but is shown to have affirmed it by having concurred in the re-employment of the scaler. *528 Moreover, it appears that, during the ten months to which this suit'relates, defendant, month by month, received the price of the logs delivered by it upon the basis of the joint scale, and it is neither alleged nor proved that it has acquired any more information since it received the first of those payments than it had before. Finally, it is said that, in a case such as this, where logs are scaled with reference to grade, and 50 per cent, of an otherwise “No. 1 common log” is scaled out for “visible defects,” the buyer should account for the other 50 per cent, in the lower grade at the lower price. That, however, depends upon whether there is any such “other” 50 per cent, left in the log; and that, in turn, depends upon the judgment and conscience of the scaler, who, in this instance, was, and still is, the choice of both litigants. Upon the whole, we find the attack upon the scale to be without support in the facts.
[3], 3. Defendant violated the contract sued on “by not doing what was covenanted to be done,” and it is liable in damages for at least such loss as plaintiff thereby sustained and such profit as it was thereby deprived of as may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. C. 0. arts. 1930, 1934. If the logs had been delivered, day by day, as contemplated by the contract, during the ten months which are involved in this suit, plaintiff would have converted them into lumber day by day, and would have sold the lumber, and the profit which may reasonably be supposed to have been contemplated would have consisted of the difference between the price realized for the lumber and the price paid for the logs, plus the expense incurred in their conversion and sale. The price of the logs and the expense mentioned were deducted in ascertaining the profit realized on the logs which were delivered, but plaintiff now contends that, as to the logs which were not delivered, the expense of their conversion into lumber should be imposed upon the defendant. We, however, find no reason why plaintiff should be relieved of that expense, and allowed to make a larger profit upon the logs not delivered than upon those delivered. Or, to state it in another way, if defendant had complied with the contract, plaintiff would have had to bear the expense of operating its mill during the ten months in question, and would have realized a profit upon all the logs called for by the contract. As the matter stands, it bore the expense of manufacturing all the logs, but realized the profit only upon those which were delivered. If it now recovers in this suit the profit that it would have made on the logs that were not delivered, it will have realized all the profit, and will have been subjected to no other expense than as contemplated by the contract. We find the evidence uncontradicted and conclusive to the effect that the profit realized upon the logs that were delivered amounted to $7.43 per 1,000 feet; and it leaves no room for reasonable doubt that the same profit would have been realized upon the other logs called for by the contract, had they been delivered. Plaintiff is now entitled, therefore, to recover that profit. But it is not entitled to recover also the expense to which it was subjected for the expected conversion of those logs into lumber. The difference in feet between the logs delivered and the whole number that should have been delivered we find to be 1,088,306, and the profit to which plaintiff is entitled, at $7.43 per 1,000 feet, is $8,086.'ll.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the principal amount thereby awarded plaintiff, from $2,405.87 to $8,086.11. It is further decreed that, as thus amended, said judgment be affirmed, at the cost of the defendant.